# CASES DETERMINED

# SUPREME COURT OF JUDICATURE

OF THE

## STATE OF NEW-JERSEY,

AT JANUARY TERM, 1851.

---

### DOWNING ET AL. v. POTTS ET AL.

1. The requirement in the first section of the act to prevent fraudulent elections by incorporated companies, which directs that a list of the stockholders entitled to vote, with the shares held by each, shall be made out ten days prior to the election, is directory only, and non compliance with it does not of itself make void the election.
2. The evidence of being a stockholder to be produced at such election comprises the stock ledger as well as the certificate book and transfer book, but the ledger is evidence only subordinate to and as supported by the other books. In case of dispute, the transfer book must control the rest.
3. The board of directors of a company cannot forfeit stock once rightly issued for the non compliance of the owner with a contract for the consideration of which it was issued, nor in any other way, except the mode provided by the charter.
4. A subscriber to the stock of an incorporated company whose subscription is received by the directors, and regular certificates thereof issued to him, is a *bona fide* stockholder entitled to transfer his stock and to vote at elections, even although he has paid nothing for his stock.

---

This is a proceeding founded on the provisions of the seventh section of the act to prevent fraudulent elections by incorporated companies. The case comes before the court, upon the application of Hugh Downing, to set aside the election of directors of

66

the New Jersey Magnetic Telegraph Company, held on the 11th of October, 1850.

There was little or no controversy in relation to the facts of the case, so far as they are deemed material to a full understanding of the questions in controversy. They are as follows:

The company was incorporated by an act of the legislature of this state, passed on the 19th of March, 1845. Its original capital was $50,000, divided into 2000 shares, of $25 each, with liberty to the directors to increase the capital to $100,000. The entire stock of $50,000 was taken by the persons interested in procuring the charter, 1945 shares being subscribed by one individual, and the remaining 55 shares being divided among 11 other persons, for the mere purpose of effecting an organization. Nothing was paid upon the stock at the time of subscription, the whole being in fact held for the benefit of the associates. No organization of the company was effected until August, 1847, when the entire stock, or, in the language of the witness, the *charter* (the stock being deemed of no value, nothing having been paid upon it,) was sold to Hugh Downing for $300. To effect the transfer, 1940 shares of the stock were transferred to Downing; the remaining 60 shares remained standing in the names of the original subscribers, in order to keep up the organization of the company. The whole stock thus became vested in Downing, as fully as it had previously been in the original proprietors.

Previous to the purchase of the stock, Downing had purchased the right to the exclusive use of House's electro-magnetic letter printing telegraph, upon a line of telegraph to be constructed between New York and Philadelphia. By the terms of the purchase, he was bound to commence the construction of the line on the first day of July, and to complete it on or before the first day of December, 1847. As a consideration for the purchase, he was bound to pay the patentees one-fourth of the capital of any company which might be incorporated to construct the line. At the time of the purchase of the stock of the telegraph company by Downing, he was actually engaged in the construction of the line, and the pur-

chase of the stock was made to enable him more readily and effectually to accomplish that object.

On the 20th of August, 1847, directors having been elected in pursuance of the charter, the company was organized, and Downing elected president. On the 2d of September, 1847, a resolution of the directors was adopted to increase the capital stock to $100,000, and, by another resolution of the same date, the president was authorized to receive subscriptions for new stock. Three subscription lists were opened : one for the city of Trenton, bearing date on the 20th of August; one for the city of Philadelphia, bearing date on the 30th of August; and a third for the city of New York, which has not been produced, and the date of which has not been manifested. In each of the subscription papers produced, Downing is stated to be the owner of one-half of the entire capital stock of $100,000; and each contains certain guaranties, on the part of Downing, to the other subscribers, in regard to the line of telegraph. Prior to the adoption of the resolution, on the 2d of September, 1847, to increase the capital stock of the company, no certificate of stock had been issued to any one. The first certificates of stock were issued on the 26th of October, 1847, and between that day and the 19th of September, 1848, certificates were issued for 4000 shares, comprising the whole capital of the company. Of this stock there were issued certificates to Hugh Downing for 1990 shares, to the patentees, in pursuance of Downing's contract on the purchase of the patent, 1000 shares, being one-fourth of the entire capital of the company, and to all other stockholders 1010 shares. On the 20th of September, 1848, a second election of directors was held, and Downing was again elected president. On the 15th of November, he reported to the board that the last issue of certificates had been made to the patentees. On the 12th of October, 1849, the third election of directors was held. In the mean time difficulties had arisen, between Downing and other members of the board, in regard to the due execution of his contract in erecting and completing the line of telegraph. On the 12th of October, though elected a director, he was removed from the office of president, and, on the same day, a resolution was

adopted by the board of directors, in his absence, that no stock standing on the books in his name should be transferred, without a resolution of the board authorizing it.  On the 12th of November, 1849, the following preamble and resolutions were adopted by the directors in Downing's absence, and without notice to him :

" Whereas the board of directors, on the 2d of September, 1847, by resolution directed that the capital stock of the company be increased $50,000, divided into shares of $25, and the president of the company (Mr. Hugh Downing) was authorized to receive subscriptions for the said additional stock ; and whereas no report was ever made by Mr. Downing to the board that any subscriptions under said resolution had ever been obtained by him, and no authority has heretofore been given to issue any certificates therefor or for any part thereof, and no money had been paid either to the company or to its treasurer upon said stock ; and whereas the said stock now stands in the books of the company in the name of Hugh Downing, who has issued to himself certificates therefor without having rendered any compensation to the company for the same, therefore—

*Resolved,* That the said certificates, so issued by Hugh Downing, late president of this company, to himself, are hereby declared to be null and void, and that said stock has never been lawfully issued, but remains the property of this company.

*Resolved,* That the president be directed to take such steps as may be necessary to warrant a reissue of the said stock, or so much thereof as may be necessary to meet the emergencies of the company."

On the same day the following resolutions were also adopted by the directors :

" *Resolved,* That the exigencies of the company require that the sum of $14,000 should be raised, as early as practicable, to put the line in good working order, and to secure the right of way for the same.

*Resolved,* That the president prepare a circular to the stockholders, offering to them the stock of the company, in proportion to the stock they severally hold, at such price as will raise

the above required sum, and that if any decline to take upon those terms, the deficiency will be made up by dividing the stock thus offered to them amongst those stockholders who are willing to take it on the terms proposed."

In pursuance of the authority contained in these resolutions, new certificates were issued for 849 shares, in lieu of part of those declared to be forfeited, and 1151 shares, the balance of the 2000 shares of new stock, was, by an entry in the stock ledger, made within ten days of the election now in question, transferred from Downing to the name of the company.

The 1151 shares, thus transferred to the company, were not voted upon at the election now in controversy. Of the 849 shares which were reissued, 799 shares were voted against the complainant. On the 2000 shares which had been declared forfeited by the board of directors, Downing was not permitted to vote. He had, in fact, certificates for only 1990 shares, but in the stock ledger he was credited with 56 other shares (the certificates for which were issued to Jane Downing and Charles P. Daly), thus making the whole stock, with what he was credited, 2046 shares. The resolution of the board having, as was supposed, deprived him of all right to 2000 shares, he was permitted to vote on the remaining 46 shares, although the certificates for that stock were issued to others.

A list of the stockholders entitled to vote was not made out ten days before the election, nor did the list produced on the day of election contain the names of Charles P. Daly and Jane Downing, two of the stockholders entitled to vote. Two tickets were voted for at the election, which was held for the election of nine directors. Of these, two names were upon both tickets. Of the remaining seven, those upon the ticket voted for by the complainant received 46 votes. Those upon the opposing ticket received 2392 votes, and were declared to be elected. At October, 1849, notice having been given of an application to set aside the election, a rule was entered, by consent to show cause, on the first day of the next term, why the election of the directors whose names were upon the successful ticket should not be set aside, and those whose names were upon the unsuccessful ticket declared to be duly elected.

The argument of the rule was had at the term of January, 1851, before the CHIEF JUSTICE and Justices CARPENTER and OGDEN.

*W. Halsted*, for *Downing et al.*, applicants; *S. G. Potts*, for *Potts et al.*, respondents.

The CHIEF JUSTICE delivered the opinion of the court.

There are two classes of objection to the election of those claiming to have been elected directors of the company, one of which affects the validity of the election itself, the other questions the propriety of the result.

I. It is objected that the election is null, and must be set aside, because a full, true, and complete list of all the stockholders of the company entitled to vote, arranged in alphabetical order, with the number of shares held by each, was not made out, as required by the statute, ten days before the election; and also because the list produced by the directors at the time and place of the election was not a full, true, and complete list of all the stockholders entitled to vote at such election.

The fact is fully established that no list of the stockholders entitled to vote was made out by the person having charge of the transfer books *ten days before the election.* It further appears that the list of stockholders exhibited by the directors on the day of election was not a *full, true, and complete list* of all the stockholders entitled to vote, in this respect, *viz.* that it omitted the names of the stockholders (Charles P. Daly and Jane Downing) who held fifty-six shares of stock, upon which, so far as appears by the evidence, they were entitled to vote. No allusion is made to other alleged errors in the list of stockholders, the existence of which depends upon the decision of other questions in the cause, but solely to errors clearly established in evidence, and which suffice to show that the list exhibited was not a full, true, and complete list of all the stockholders entitled to vote. It is insisted, on behalf of the party complaining, that these omissions to comply with the requirements of the act are fatal to the validity of the election, and that, by reason thereof, the election is *ipso facto* null and

void. We are of opinion, however, that the true construction of the act does not warrant such conclusion. The statute, while it prescribes that the list of stockholders entitled to vote shall be prepared and exhibited, does not declare the election void by reason of a failure to comply with such direction ; and a careful consideration of the provisions of the act demonstrates that such construction would contravene at once the intention of the legislature and the general policy of the act.

The first section directs that the transfer books and the books containing the names of the stockholders shall be open to the inspection of every stockholder in the company, at all times during the usual hours of transacting business, for thirty days previous to any election of directors ; and that a full, true, and complete list of all the stockholders entitled to vote, with the number of shares held by each, shall be made out, at least ten days before the election, by the person having charge of the transfer books ; and shall, in like manner, be open to the inspection of every stockholder. The section further subjects the officer having charge of the books to a penalty of $200 for neglect or refusal, upon demand made by any stockholder, to exhibit such books or list, or to submit them to examination. The frauds in elections, which this statute was designed to prevent, are mainly those which may be effected by the directors or officers having the control of the books of the company. The design of the first section was to afford to every corporator a knowledge of his co-corporators, and an opportunity of corresponding with them on the affairs of the institution, of the necessity or expediency of a change in its direction, and thereby rescuing the election from the immediate control of the board or of officers whose misconduct or incapacity may have rendered a change necessary. It could never have been the design of the legislature to put it in the power of the directors, or any other officer of the company, entirely to defeat an election, by failing to comply with directions of the statute designed to operate as a check upon the misconduct of those very officers. That this is the true construction of the fourth section, is apparent from its terms. After enacting that the directors shall produce at the time and place of election a list

of the stockholders entitled to vote at such election, it provides that the directors refusing to produce such list shall be ineligible to any office at such election. If the election be void, the prohibition is a nullity. The provision clearly contemplates the *validity* of the election. It merely disqualifies the delinquent directors from being candidates, thus inflicting the penalty of non compliance upon them. If a refusal or neglect by the directors to produce the list of stockholders be construed to defeat the election, such construction would enable the directors at pleasure entirely to defeat the election, in direct contravention of the general design and policy of the act.

The suggestion made upon the argument, and earnestly pressed upon the court, that the list of voters required to be prepared and exhibited previous to the election operates as a registry of voters, and must therefore be rigidly enforced, does not appear to be well founded. The list of stockholders does not operate as a registry of voters. The right of the stockholder to vote does not depend upon his name being contained in the list; on the contrary, the statute expressly declares that the books of the corporation shall be the only evidence who are the stockholders entitled to vote.

The provisions of the first and fourth sections of the act must, we think, be regarded as directory merely; and a failure to comply with either of these provisions will not, of itself, avoid the election. A mere omission to make out the prescribed list the specified time before the election, or a failure on the part of the directors to exhibit at the time and place of election a full, true, and complete list of all the stockholders entitled to vote, constitutes in itself no sufficient ground to declare the election a nullity. Such omission may have been the result of accident or inadvertence, and may occasion no prejudice to the right of any corporator. There should, at least, be made manifest reasonable ground for apprehending that such omission operated prejudicially to the rights of the party complaining.

By the seventh section of the act, this court are required to inquire into the matters or causes of complaint, and thereupon to establish the election complained of, or order a new elec-

tion, or make such order and give such relief in the premises as *right and justice* may appear to require. The court are not to avoid an election merely because a technical error has been committed or the provisions of the act not strictly complied with, unless there is reason to apprehend that the fairness of the election has been impaired or the claims of right and justice defeated.

There does not appear, from the evidence in this case, reason to apprehend that any prejudice did actually result, or could have resulted, to the fairness of the election or the rights of the corporator by the omissions complained of. The party was permitted full access to the books of the company. When informed that the list of stockholders had not been made out, as prescribed by the statute, he neither requested it to be furnished nor complained of its non existence. From his previous connection with the company, there seems no reason to apprehend that he was ignorant of any material fact, the knowledge of which could have been supplied if the list had been made out ten days before the election, from the books as they then stood. If the party complaining be aggrieved, it is not by a failure to make out or exhibit a list of stockholders, as required by the act. We do not perceive, therefore, that right or justice requires this election to be set aside on the ground of such omission.

II. It is objected that the inspectors erred in rejecting legal votes offered by the complainant, and in admitting illegal votes offered by others.

At the election, Downing offered to vote on 1940 shares of stock. He was admitted to vote on 46 shares only, and his claim to vote on the remaining 1894 shares was rejected. By the *transfer book*, it appeared that Downing owned 1940 shares. By the *certificate book*, it appeared that he owned 1990 shares. But by the *stock ledger*, as it stood on the day of election, it appeared that he owned only 46 shares. The inspectors of election rejected the evidence furnished by the certificate book and by the transfer book, and relied upon the stock ledger as evidence of the number of shares upon which

the stockholder was entitled to vote. Were they correct in so doing?

The statute (*Rev. Stat.* 139, § 1,) provides that *the book or books in which the transfer of stock shall be registered and the books containing the names of the stockholders* shall be open to examination for thirty days previous to any election of directors. It further provides that "*the book or books aforesaid*" shall be the *only evidence* who are the stockholders of such company entitled to vote at any election for directors. Upon a literal reading of the act, the phrase "the book or books aforesaid," in the last clause, may appropriately be referred to "the book or books" in which the transfer of stock is registered, and thus exclude the *books containing the names of the stockholders*. And some countenance is given to this literal construction by the eighth section of the act, which enacts that all such shares as may appear standing on the *transfer book* in the name of any person or persons, shall and may be voted on by such person or persons. This, however, it is obvious is not the true construction of the act. Because, if such construction be adopted where there has been no transfer of stock, and consequently no entry in the transfer book, there can be no evidence whatever of a right to vote, for the statute declares that the book or books aforesaid shall be the *only evidence who are the stockholders entitled to vote*. The phrase "book or books aforesaid," in the latter clause of the section, must be construed to include not only "the book or books in which the transfer of stock shall be registered," but also "the books containing the names of the stockholders."

It is insisted, however, that "the books containing the names of the stockholders" must be construed to mean only the books of original subscription or the books in which the stockholders have themselves subscribed their names. But, if this construction be adopted, the design of the enactment of the first clause of the section is in great measure defeated. The object of that provision was to furnish full information of the names of all the stockholders. This, in many cases, would not be furnished by the mere production of the original subscription lists and transfer books. In fact, the subscription lists in this very case,

and probably in many others, do not furnish the names even of the original stockholders in the company. Stock subscribed may not be taken. The certificates may be, at the instance of the subscribers, issued in the names of other persons. The certificate book therefore may, and in this case does furnish fuller and more accurate information of the names of the stockholders than the subscription lists themselves. The phrase "the books containing the names of the stockholders" was used by the legislature in its ordinary and popular signification, and must be construed to mean all the books of the company in which the names of the stockholders are regularly registered. It includes, therefore, not only the books of original subscription, but the certificate book, and we incline to think the *stock ledger* also. But when the legislature declared that the books aforesaid shall be the only evidence who are the stockholders entitled to vote, it cannot be supposed that they designed to introduce new rules of evidence or to subvert its plainest principles. They declare that the books of the company shall be the only evidence of a right to vote. No other evidence shall be appealed to ; no transfer of property in the stock, between the parties, shall avail against the evidence of the books upon the question of a right to vote. But they do not declare that every book in which the names of the stockholders may be written shall be evidence, nor do they establish the relative weight to which these books may be respectively entitled. Now the stock ledger is not a book of original entries, it is a mere transcript from other books. It is not original evidence. It can be of no value as evidence, unless so far as it is sustained by the original entries. If made evidence by force of the enactment (which seems not entirely free from doubt) it never could have been designed to supersede, much less to contravene the original entries themselves. No entry, therefore, in the stock ledger, or omission of an entry in that book, could deprive a party of his right to vote, who appeared by the certificate book to be the owner of shares which did not appear to have been transferred, or who appeared by the transfer book to be the owner of stock there standing in his name.

But the right of Downing to vote upon 1940 shares of stock rested not upon any general rule of evidence, but upon the express provision of the statute. By the eighth section of the act it is enacted, that when the right of voting upon any share of stock shall be questioned, it shall be the duty of the inspectors to require the *transfer book* of said company as evidence of stock held in said company, and all such shares as may appear standing thereon in the name of any person shall and may be voted on by such person, subject to the provisions of the act of incorporation. In rejecting the evidence of the transfer book, and relying upon the stock ledger, the inspectors acted not only in violation of the plainest rules of evidence, but in contravention of the express provisions of the statute. It is no answer to say that the transfer book had not been much used, or that it did not truly represent the actual condition of the stock. The fact, that the books have been negligently or improperly kept, cannot work a repeal of the statute, or relieve against its operation. The inspectors erred, therefore, in disregarding the evidence of the transfer book, and thereby depriving the complainant of his right to vote upon the shares of stock standing thereon in his name.

The error in this case is made, if possible, more palpable from the fact, that the entry in the stock ledger, by which it was made to appear that Downing was entitled only to 46 votes, was made within ten days of the election. Had the list of voters been made out, as required by law, ten days before the election, Downing would have appeared upon all the books to be entitled to vote, at least upon the whole number of shares upon which he claimed to vote. To suffer his right to be divested by an entry made in the stock ledger within ten days of the election, would be not only in violation of the provisions of the statute, but of the most obvious dictates of right and justice. To permit the success of such an expedient, no matter how honest the motive from which it originated, would open a door to the grossest frauds, and prepare the way for the utter prostration of the rights of stockholders and the purity of elections.

But it is contended that the transfer of 1940 shares by Sherman to Downing upon the transfer book was not such a trans-

fer as the statute contemplates ; that Sherman himself held no certificates for the stock, and that the design of the transfer was merely to vest the charter in Downing.   But Sherman, it is admitted, subscribed for the shares, and held them in his own name.   He held, it is true, no certificate, but the certificate would have been merely the evidence of the admitted fact of his ownership of the stock.   He sold them, with the consent and approbation of all the parties interested, to Downing for a valuable consideration, and made a formal transfer of them upon the transfer book to Downing.   The case appears to fall both within the letter and spirit of the statute, making the transfer book evidence.   But if the transfer book be entirely rejected the case is not materially altered.   Downing appears, upon the certificate book, as the owner not of 1940 shares only, upon which he offered to vote, but of 1990 shares, and there is no evidence upon the transfer or certificate book that he has divested himself of his title to one of those shares.   Whether, therefore, recourse be had to the certificate book or to the transfer book, it is still apparent, by the books which the statute declares shall be the only evidence who are stockholders entitled to vote, that Downing was entitled to vote upon 1940 shares, the whole number upon which he claimed the right to vote.

It is further insisted that Downing was not the *bona fide* owner of all the shares of stock standing in his name upon the books of the company ; that he had in fact disposed of all his stock except 46 shares, upon which alone he was entitled to vote, and that this court is bound to look behind the legal right, appearing on the face of the books, to ascertain what right and justice require.   The court are thus called upon to decide whether Downing, at the time of the election, was the rightful and legal owner of the stock standing upon the books of the company in his name.   As this question was very fully and elaborately discussed upon the argument, and as its decision may affect the conduct of a future election, it may be proper to consider it.   In doing so, we shall confine our inquiry to the simple question of the rightful ownership of the stock, without entering at all into the merits of the controversy between the

parties upon other points, or pausing to consider whether under the provisions of the statute, any other evidence than the books there specified can be resorted to as evidence of the right to vote.

Was Downing the rightful owner of the stock in question?

I. He held in his own name the certificate for this stock, issued in due form under the seal of the company, signed by the president and secretary. These constitute, as between himself and the company, the legal and proper evidence of his ownership. Certificates for 600 shares were issued in May, 1848, and for the remaining 1360 shares on the 6th of September, 1848. He continued to hold this stock until the 12th of November, 1849, when the board resolved that the certificates in his hands were void. During this period, of more than a year, the stock stood in Downing's name upon the books of the company; the directors were apprized that the certificates had been issued; two elections for directors had taken place, Downing's title to the stock and the propriety of the issue of the certificates seem to have been unquestioned. There were controversies, indeed, between himself and the directors in regard to the due performance of his contract, but none in regard to his title to the stock. But it is said, that although he held the certificates, he had not paid for the stock. Admitting the averment to be literally true, that he had paid nothing, still if the certificates were properly issued, or if Downing was legally entitled to them, his failure to pay up instalments would not work a forfeiture, except in the mode specially pointed out in the charter. But it is not pretended that the stock was declared forfeited under the provision of the charter for non payment of instalments. On the contrary, it is in evidence that no instalments were ever called for. The resolution declaring the certificates forfeited proceeds upon a totally different ground. It assumes that Downing never owned the stock, and that the certificates were improperly issued. The holding of the certificate creates a legal presumption of rightful ownership, which can only be overcome by proof that it was illegally issued or legally forfeited. There has been no legal forfeiture. Were they illegally issued? The certificates

are the evidence furnished by the company of ownership of stock; they are the stockholder's title to his property, made by the corporation. If alleged to be illegally or fraudulently issued, the burthen of proof is upon the party making the allegation.

What are the facts? In August, 1847, Downing purchased, in his own name, for the consideration of $300, the charter of the company, and all chartered rights existing under it. To vest the title in him, 1940 shares, which had been originally subscribed by W. P. Sherman, were transferred to Downing. The remaining 60 shares, which composed the original stock of the company, remained standing in the name of other persons, in order to maintain the organization of the company. By the purchase, Downing became the owner in equity of the whole original stock of the company, consisting of 2000 shares. He had previously purchased, in his own name, the right to the exclusive use of House's patent electro-magnetic printing telegraph, upon a line to be constructed between the Hudson river and the city of Philadelphia, and was then engaged in the actual construction of the line. He had contracted that the line should be commenced on the 1st of July, and completed by the 1st of September, 1847. To what extent materials had been provided or work done does not appear. But the work was continued and prosecuted by him, without, so far as appears, having any authority conferred upon him for the purpose, or entering into any agreement with the company as a contractor.

Thus matters stood at the time of the purchase of the stock by Downing and the organization of the company, in August, 1847. At the second meeting of the directors, the original capital of $50,000 being deemed insufficient to purchase the patent, construct the line, and secure the right of way, the capital stock was ordered to be increased to $100,000, the full amount authorized by the charter, and the president (Downing) was authorized to receive subscriptions. Subscriptions were accordingly opened. Upon two of these subscription papers, which have been made exhibits in the cause, it is expressly stated that the capital stock of the company specified in the charter

is $100,000, and that Hugh Downing is the proprietor of one half of the stock of the company; as such proprietor, he guarantees the complete and substantial construction of the telegraph line, ready for operation, by the first of November; and to one set of subscribers he further guarantees an annual dividend of ten per cent. upon their stock for a term of years.

The precise nature and extent of Downing's interest in the stock does not very clearly appear. From the evidence in the cause, it would seem to have been the understanding, of a part at least of the stockholders, that the patentees were to have one-fourth of the stock for the patent right, Downing one-fourth for his services in getting up the enterprise, and that for the residue of the stock held by Downing, he was to stand upon the footing of other stockholders, and to be accountable to the company for the price of the stock. But, however this may be, it is certain that he purchased and paid for the entire original stock of 2000 shares, and by that purchase became the rightful owner; that he was recognized by the subscribers for stock, upon the face of the subscription paper, as the proprietor of 2000 shares, or one half of the entire capital specified in the charter; that he held the certificates with the knowledge of the board; that he was recognized and treated as the rightful owner, both before and after the issue of the certificates, for a period of more than two years. Until the time that the directors adopted the resolution forfeiting the stock, there is no suggestion of fraud or unfairness in procuring the certificates. It is now insisted that he held this stock as a trustee for the company. It is not easy to perceive the ground upon which this suggestion can rest. It may be that he has not fully paid for stock for which he is bound to pay; that the expenditures made and the services rendered by him for the company will not prove, upon a settlement of accounts, fully equal to the price of his stock, for which he may be bound to account. But this can neither convert him into a trustee, so as to strip him of his right to vote, nor deprive him of the legal ownership of the stock.

Between the 20th October, 1847, and the 19th of September, 1848, while the resolution of the directors authorizing

Downing to procure additional subscriptions remained in force, certificates were issued for 4000 shares of stock, the whole capital authorized by the charter. Of these, one-fourth, or 1000 shares, were issued to the patentees, in pursuance of Downing's contract, about one half, or 1990 shares, to Downing himself, and 1010 shares to all other persons. Of these last, 40 were issued to Charles P. Daly and 16 to Jane Downing, but are credited upon the book to Hugh Downing, and, if rightly so credited, would make the entire number of shares held and controlled by him 2046.

The resolution of the directors, on the 12th of November, 1849, declaring Downing's certificates to be null and void, proceeds upon the assumption that all the certificates of stock held by Downing were for the increased stock authorized by the board on the 2d September, 1847, and not for the original stock purchased and owned by him; and the resolution is attempted to be justified by the allegation that he had made no compensation to the company for the stock so issued.

In issuing the certificates, no distinction was made between the original stock and the increased stock. Upon what ground, then, does the assumption rest, that Downing had disposed of all the original stock owned by him, and issued to himself only certificates for the new stock.

The natural and reasonable presumption would be, that the certificates issued to himself were for the stock which he owned, and for which he was entitled to the certificates, and not for stock which he did not own. When he was authorized to procure new subscribers, it was not for stock already owned by himself, but for the new stock, which the directors had, at the same meeting, authorized to be created. No subscriber for the stock could have supposed that he was subscribing for the original stock, which had long before been subscribed by Sherman and his associates, and transferred to Downing, and of which the subscriber himself recognized Downing as the proprietor. The subscription does not purport to be a contract with Downing to purchase of him his individual stock. It is a contract on the part of the subscriber to take stock in the company, recognising Downing as the proprietor of one half of the

capital stock, Downing, as such proprietor, guaranteeing to the subscribers the proper and prompt completion of the line of telegraph which he was engaged in constructing and a given amount of dividends upon the stock.

The circumstance that the subscription papers bear date a few days before the adoption of the resolution by the board to increase the capital, and that one of the subscribers was elected a director prior to the adoption of that resolution, is not sufficient to overcome the weight of opposing testimony and warrant the conclusion that these subscriptions were made for the original stock of the company.   We think it clear, upon the whole evidence, that these subscriptions were opened in pursuance of the determination of the board to increase the capital stock, and that the subscriptions were in fact made for such increased stock.

In point of fact Downing never did transfer one share of his stock in the mode designated by the by-laws of the company for the transfer of stock.   On the contrary, he issued certificates to every subscriber for the shares subscribed by him, in the same manner as he issued them to himself for his own stock.   They all stood as original stockholders (whether of old or new stock), and not as holders of transferred stock.   That he did not transfer his own stock, but issued original certificates to all the stockholders for an amount in the aggregate equal to the entire capital of the company, is the best evidence that such was the understanding of the parties.

That Downing should have deliberately sold every share of his individual stock, and thus stripped himself of all interest in a company in whose success he had a deep stake, and that he should thus have voluntarily deprived himself of all control over the affairs of the institution, and all power to protect his own rights and interests, is in the highest degree improbable. There is no adequate motive for such a course.   There is no evidence that he designed to adopt it.   In point of fact he has not transferred his own stock, and no court will act upon the presumption that he designed to do an act which would at once involve him in a wrong and deprive him of his property.

Downing, then, was the legal and rightful owner of the

stock claimed by him when he received his certificates. He was entitled to the certificates, as the legal evidence of his ownership. They were rightfully and duly issued. His subsequent failure to fulfil his contracts with the other stockholders (if there were such failure) could work no forfeiture of his stock. His faithful performance of his contract with the other stockholders was not a condition precedent to his ownership of the stock ; on the contrary, his contract with them was based upon the fact that he was the owner of one half of the stock of the company, and that fact formed the inducement for his guaranty. We are of opinion, upon the evidence before us, that Downing was entitled to vote upon all the shares upon which he offered to vote, not only by the evidence furnished by the books of the company, but also because he was the legal and rightful owner of the stock.

The whole capital of 4000 shares having been taken, and certificates therefor issued prior to the resolution of the 12th of November, 1849, declaring Downing's certificates void, and authorizing a new issue, it is clear that the stock issued in pursuance of that resolution, being beyond the capital authorized by the charter, was illegally issued, and conferred no right to vote upon those holding it. So far as those votes were received, they must be rejected in ascertaining the true state of the poll.

It remains to be seen whether the legal votes rejected and the illegal votes received are sufficient to change the result of the election, for otherwise the election cannot be set aside. *McNeely* v. *Woodruff*, 1 *Green* 352 ; *Ex parte Murphy*, 7 *Cowen* 153 ; *Ex parte Wilcock, Ib.* 408.

The whole number of votes cast at the election was 2438. Two tickets were voted, containing, each, the names of nine directors. Of these, the names of Robert M. Lewis and Hugh Craig were upon both tickets, and received the whole number of votes cast. Their election must stand. Of the other seven candidates, Joseph C. Potts and others, whose names were upon the successful ticket, received 2392 votes, and Hugh Downing and others, whose names were upon the unsuccessful ticket, received 46 votes. Of the 2392 votes given to the

successful candidates, 799 votes were upon the new issue of stock, and ought not to have been received. Deducting these illegal votes, the number of votes for the seven directors declared to have been elected would be 1593. If the 1894 votes offered by Downing, which were rejected, had been cast for the opposing ticket, the result of the election would have been changed. The election, therefore, of Joseph C. Potts, Francis Morris, Johnston Livingston, Royal E. House, Gregory A. Perdicaris, James C. Bell, and Thomas Robbins must be set aside, and a new election for the choice of seven directors ordered.